**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

JUDY SHEINDLIN,

       Plaintiff,

     v.

ACCELERATE360, LLC, and A360
MEDIA, LLC,

       Defendants.

**Civil Action No.**

2:24-cv-00553-JLB-NPM

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM OF LAW IN SUPPORT**

Pursuant to Federal Rule of Civil Procedure 56, Defendants A360 Media,

LLC ("A360") and Accelerate360 Media, LLC ("Accelerate") ("Defendants")

respectfully request that the Court enter summary judgment in their favor on the

single count for defamation filed against them by Plaintiff Judy Sheindlin

("Sheindlin") in this action.

**MEMORANDUM OF LAW**

In April 2024, A360 published two articles, one in the *National Enquirer*

print edition and one on *In Touch Weekly's* website, reporting that Sheindlin, the

television arbitrator known as Judge Judy, had appeared in a docuseries voicing

support for the Menéndez brothers, amid ongoing public debate over their bids

for resentencing or parole.  Unfortunately, the docuseries had featured footage of

a different woman, whom the reporter had mistakenly believed to be Sheindlin.

The Court should grant summary judgment for Defendants on Sheindlin's

defamation claim because the undisputed material facts demonstrate that she cannot prove that Defendants acted with the requisite "actual malice" and cannot produce any evidence of actual harm, as required by Florida law. Sheindlin also cannot prove that Accelerate had any role in publication. Even if her claim were to proceed, the Court should grant summary judgment in Defendants' favor on Sheindlin's request for punitive damages, as she also cannot prove express malice or outrageousness, as required by Florida law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In April 2024, A360, through its subsidiary A360 Celebrity Publications, LLC, owned and operated the *National Enquirer* and *In Touch Weekly*. Answer (Dkt. 27) ("Ans.") ¶¶ 2-3.

2.      On April 3, 2024, A360 published an article titled "Baloney! Judge Judy on warpath to save Menéndez bros" in Issue 17 of the *National Enquirer*. Ex. 1, Dep. of James Robertson, corporate representative for A360 ("A360 Dep.") 165:6-11; Ex. 3, A360 Dep. Ex. 27; Ans. ¶ 3; Ex. 7, Dep. of Judy Sheindlin ("Sheindlin Dep.") Ex. 30 at 1 & 38 ("NEQ Article").

3.      Although the cover reflects a later date of April 22, 2024, A360 sent Issue 17, which included the NEQ Article, to print on April 3, 2024. A360 Dep. 165:10-11; Ans. ¶¶ 33, 36; *see also* Compl. ¶ 36 n.16; Sheindlin Dep. Ex. 34.

4.      Beginning the following day, Issue 17 was distributed to retail sellers, who displayed it on newsstands for roughly one week, beginning April 10, 2024. A360 Dep. 119:3-19, 123:12-17; Ans. ¶¶ 33, 36.

2

5.    On April 10, 2024, A360 published a nearly identical article, titled "Inside Judge Judy's Quest to Save the Menéndez Brothers Nearly 35 Years After Their Parents' Murder" on the website of *In Touch Weekly*. Ans. ¶ 2; Sheindlin Dep. Ex. 29 ("In Touch Article") (together with the NEQ Article, the "Articles").

6.    The In Touch Article was taken down the same day. Ans. ¶ 33; A360 Dep. Ex. 22 (confirming at 8:43 pm on April 10, 2024, that the In Touch Article "has been removed from the site/CMS").

7.    Accelerate did not have any role in drafting, editing, or publishing the Articles. Ex. 23, Defs.' Suppl. Resp. to Interr. 23 at 1-2; A360 Dep. 29:13-25.

### The Menéndez Brothers

8.    The Menéndez brothers, Lyle and Eric Menéndez, killed their parents in 1989. Their first trial, in which their counsel argued that their father had sexually and physically abused them, ended in a hung jury. Their second trial, in which the judge excluded this evidence, ended in convictions for murder. Ex. 11, Dep. of Sameer Somal ("Somal Dep.") Ex. 14 at 1-2; *see* NEQ Article.

9.    In recent years, celebrities, members of the public, and even the Los Angeles County District Attorney have supported resentencing or release of the Menéndez brothers, who have served more than thirty-five years in jail and were recently eligible for parole. *See, e.g.*, NEQ Article; Somal Dep. Ex. 14 at 1-2; A360 Dep. Ex. 5 at 2-3; Sheindlin Dep. Ex. 32 at 2-3.

### Drafting and Editing the Articles

10.    On March 25, 2024, Fox News informed A360 of Fox's upcoming

3

docuseries, *Menendez Brothers: Victims or Villains*, to see if A360 was interested in writing about it.  A360 Dep. 137:22-138:10; A360 Dep. Ex. 5.

11.    A360 editor Dan Dolan sent Fox's pitch to reporter Michael Jaccarino and asked Jaccarino to consider whether the docuseries merited an article, especially as *National Enquirer* had recently run a story on the Menéndez brothers' bid for resentencing.  A360 Dep. Ex. 5.

12.    The Fox email contained excerpts and links to clips from the docuseries, as well as the promotional trailer ("Trailer"), available at https://www.youtube.com/watch?v=zLbyG8ZYFAM.  A360 Dep. Ex. 5.

13.    The Trailer, among other things, shows a brief clip of an older woman with short hair, dressed in black with a decorative white collar, stating that she thought the trial was "rigged."  Trailer at 1:03.  The Trailer does not identify the woman by name or role.  *Id.*; Ex. 4, Dep. of Michael Jaccarino ("Jaccarino Dep.") 63:6-18, 64:1-65:6.

14.    Jaccarino testified that, when watching the Trailer, he believed that woman to be Sheindlin, based on her clothing and appearance and because she was opining about a legal matter, as a judge might.  Jaccarino Dep. 72:8-24, 108:24-110:08.

15.    He also testified that he was familiar with Sheindlin's appearance but had not seen a photo of her recently and assumed she had aged since he last saw her photograph.  *Id.* 66:1:23, 70:22-71:7, 72:8-73:23.

16.    Jaccarino sent Dolan several story ideas, including that the

docuseries "[a]pparently also has Judge Judy saying she thinks the trial was rigged," but noted that he would need to get more of the interview footage from Fox to write that proposed story. *Id.* at 75:10-14; Ex. 5, Jaccarino Dep. Ex. 4.

17.    Dolan greenlit a story about "Judge Judy." Jaccarino Dep. Ex. 4.

18.    Jaccarino then emailed Fox to ask for "any additional video of the Judge Judy interview," noting that the Trailer only includes "a small snippet . . . in which she opines that the trial was rigged." Jaccarino Dep. Ex. 6.

19.    The Fox PR team responded, "please see below for a link to the Judge Judy clip" and provided a link to a longer clip from the docuseries. *Id.*; Jaccarino Dep. Ex. 21 ("Second Clip").

20.    The Second Clip shows more of the interview of the same woman in the Trailer. Jaccarino Dep. Ex. 21. For roughly 3 seconds of the 39-second clip, it includes a caption identifying the interviewee as "Judi Zamos." *Id.* at 0:03-06.

21.    Jaccarino testified that he played the Second Clip, focusing on his keyboard while typing to ensure he transcribed the interviewee's statements correctly, and that, as a result, he did not notice the 3-second appearance of the caption. Jaccarino Dep. 86:1-88:15.

22.    In the Second Clip, the interviewee says that she believed the Menéndez brothers' second trial was conducted "very, very different" than the first trial and suggested to the brothers' defense attorney that they should have sought recusal of the judge before the retrial. Jaccarino Dep. Ex. 21 at :11-15.

23.    Although Zamos had been an alternate juror in the first trial, neither

5

the Trailer nor the Second Clip mentions that fact. *Id.*; Jaccarino Dep. 103:18-105:13.

24.    Jaccarino testified that nothing in the interviewee's statements in the Second Clip signaled to him that she was not "Judge Judy," particularly given his emails with the Fox PR team. Jaccarino Dep. 109:10-14, 110:6-8.

25.    Jaccarino drafted the NEQ Article, annotating his sources, researching details about the Menéndez brothers' case, and contacting a defense attorney for his perspective on the bid for resentencing. *Id.* 91:1-4, 106:17-108:12; Jaccarino Dep. Ex. 7.

26.    Jaccarino sent the draft to his editor, Michael Hammer, for review. Jaccarino Dep. 91:23-93:21; Jaccarino Dep. Ex. 7.

27.    Jaccarino testified that, when he wrote the NEQ Article, there was "no question" in his mind that he was looking at "Judge Judy" in the Trailer and Second Clip and that nothing in his reporting caused him to doubt this. Jaccarino Dep. 109:10-111:12.

28.    Jaccarino testified that if he had seen the interviewee's name, he would not have written the story. *Id.* at 88:1-15.

29.    A360 editors thought that the Articles would resonate with *National Enquirer* and *In Touch Weekly* readers, who often like true crime stories, such as the Menéndez brothers. Ex. 113, Dep. of Emma Hernandez ("Hernandez Dep.") 24:14-26:1, 28:18-29:6.

6

### *Publication and Realization of Mistake*

30.     On April 10, when *National Enquirer* Issue 17 was scheduled to hit newsstands, A360 published a nearly identical version of the NEQ Article on the *In Touch Weekly* website.  Ans. ¶¶ 2-3; Hernandez Dep. 30:22-23.

31.     A360 published the Articles because the public was interested in the Menendez brothers in the spring of 2024 and in true crime, generally.  *See* A360 Dep. 138:11-14, 154:21-25 ("the Enquirer and other staff would have been looking at the Menendez brothers for potential stories"), 206:23-207:25; *see also* Jaccarino Dep. 59:21-22 ("[t]hey're a recurring story").

32.     Sheindlin learned of the In Touch Article on April 10, 2024.  Ex. 6, Sheindlin Dep. 108:24-109:8.  She did not personally contact *In Touch Weekly* or A360 to alert them to the misidentification.  *Id.* 112:16-113:5.

33.     Instead, she contacted her long-time public relations representative, Gary Rosen, to inform him.  *Id.* 109:25-110:5, 110:25-111:7.

34.     Rosen contacted a former A360 employee, Adriane Schwartz, and believes he may have called a general phone number for A360.  He never reached anyone at A360 to alert them to the misidentification.  Ex. 8, Dep. of Gary Rosen ("Rosen Dep.") 41:11-16, 43:7-44:19, 46:4-24.

35.     Schwartz contacted Nate Grant, an A360 digital reporter, who informed Robertson, the editorial director for A360, that Sheindlin was threatening to sue.  Ex. 28.

36. The message did not explain why Sheindlin was threatening to sue or that she had not appeared in the docuseries. *Id.*

37. Robertson provided Grant with contact information where Rosen could reach him, and Grant forwarded Robertson's email address to Rosen. *Id.*; Ex. 26; *see* Rosen Dep. 143:14-20.

38. Rosen did not contact Robertson. A360 Dep. 72:8-20; *see* Rosen Dep. 143:24-144:5, 145:3-9.

39. Instead, Rosen pitched a story to another publication, the *Daily Mail*, about Sheindlin's plan to sue *In Touch Weekly* over the misidentification. Rosen Dep. 52:20-21, Ex. 9, Rosen Dep Ex. 18.

40. The *Daily Mail* reporter contacted A360 for comment. A360 Dep. 71:15-24; Ex. 27.

41. Robertson spoke with Dolan and soon realized that the Articles had incorrectly identified Sheindlin. A360 Dep. 171:2-20.

42. Robertson directed Emma Hernandez to delete the *In Touch* Article from the website and social media, and she did so within the hour. A360 Dep. 180:10-19, 182:23-183:5; A360 Dep. Exs. 21-22.

43. A360 also requested that outlets known to have republished the Article remove the content. A360 Dep. 183:10-184:16.

44. Jaccarino testified that, when Dolan informed him of the mistake on April 10, Jaccarino's initial response was to reiterate his understanding that Sheindlin had appeared in the docuseries. Jaccarino Dep. 121:7-123:16.

45.    Jaccarino testified that, only when he rewatched the Second Clip that evening, in response to Dolan's call, did he realize that he had misidentified the woman as Sheindlin.  *Id.* at 123:17-124:10.

46.    On April 18, 2024, Sheindlin's counsel sent a letter to A360, threatening to sue for defamation over the In Touch Article.  *See* Compl. ¶ 34; Sheindlin Dep. Ex. 31.

47.    On April 24, 2024, A360's in-house counsel sent a letter in response, "apologiz[ing] profusely to Judge Judy for this unfortunate mistake and misidentification" and offering to discuss possible resolutions.  Sheindlin Dep. Ex. 32 at 1.

48.    Robertson testified that A360 did not immediately issue a retraction because, in the context of celebrity news, if there is an error, A360 generally tries to confirm the celebrity's preference on possible resolutions.  A360 Dep. 208:23-209:24, 211:7-212:8.

49.    On April 29, 2024, Sheindlin's counsel sent a second pre-suit letter regarding the NEQ Article.  Compl. ¶ 39; Sheindlin Dep. Ex. 33.

50.    A360 responded on May 3, 2024, clarifying the publishing timeline and again offering to discuss resolutions.  Sheindlin Dep. Ex. 34.

51.    Sheindlin and her lawyers did not respond to A360's offer to discuss resolutions.  *See* Sheindlin Dep. 160:9-22, 163:21-164:2 (testifying that she has "no idea" whether an apology was requested or further conversations were had on her behalf).

52. Sheindlin filed this lawsuit on May 13, 2024. *See* Dkt. 1-1.

53. When she did, Rosen worked to ensure coverage in a broad range of news outlets about the Articles and Sheindlin's lawsuit, including reaching out to outlets and responding to outlets that contacted him. Rosen Dep. 120:1-15, 121:17-123:1, 126:14-127:12, 130:3-137:25; *see* Rosen Dep. Exs. 22-27.

54. Thanks in large part to Rosen's efforts, many outlets reported on Sheindlin's suit, with several including a statement from her that Rosen had provided to them. Rosen Dep. 130:3-5 (Daily Mail), 133:7-9 (Today Show), 135:24-136:1 (Deadline), 137:16-18 (AP), 137:23-25 (Entertainment Weekly); *see also id.* 138:1-14.

### *Sheindlin and the Alleged Impact of the Articles*

55. Sheindlin is a lawyer, author, and former public servant, who served as a family court judge in New York City from 1982 to 1996. Compl. ¶¶ 18, 23; Sheindlin Dep. 14:20-23, 15:23-25, 24:13-25:11.

56. Sheindlin has been a television personality for nearly thirty consecutive years, including as the star of *Judge Judy*, broadcast by CBS from 1996 to 2021, and the star of *Judy Justice*, streaming on Amazon Prime, from 2021 through to the present. Compl. ¶¶ 19-20; Sheindlin Dep. 23:3-24:12.

57. On *Judy Justice*, and *Judge Judy* before that, litigants appear to present and arbitrate small claims cases before Sheindlin, whose rulings are binding on the parties. Sheindlin Dep. 53:17-54:13.

58. Sheindlin alleges in this case that she was defamed by having been

described as supporting the Menéndez brothers' bid for resentencing or parole or as questioning the fairness of another judge's trial, but she has not identified any actual injury flowing from this alleged defamation. *See* Compl. ¶¶ 6-9.

59.  Sheindlin objects that A360's predecessor, American Media, Inc. ("AMI"), had published an inaccurate article about her in 2017, *see* Compl. ¶ 42, but she acknowledges that ███████████████████████████████ ████████████████████████████████████████████ ████████████████. Sheindlin Dep. 96:22-97:6, 99:23-103:20, Ex. 28; A360 Dep. 133:2-136:13.

60.  Sheindlin cannot identify any business or professional opportunities that she lost because of the Articles. Ex. 21, Pl.'s Suppl. Resp. to Defs.' Interrog. 5 (no reduction in new contacts or business opportunities); Ex. 22, Pl.'s Resp. to Defs.' Req. for Admis. 6-9 (no lost business opportunity, income, or financial opportunity); Pl.'s Resp. to Defs.' Req. for Admis. 14 (no financial harm).

61.  Amazon ordered all four seasons of *Judy Justice*, as originally contemplated, with a fourth season scheduled to stream in 2026, and Amazon debuted a new television program, *Justice on Trial*, also starring Sheindlin, after the Articles were published. Sheindlin Dep. 23:19-23, 24:2-5, 26:2-14, 27:19-28:7, 63:11-20, 68:2-69:25.

62.  Sheindlin is not seeking damages for emotional distress. Pl.'s Resp. to Defs.' Req. for Admis. 12; Pl.'s Suppl. Resp. to Defs.' Interrog. 11.

63.  Sheindlin cannot identify any specific person who thinks less of her

because of the Articles.  Pl.'s Suppl. Resp. to Defs.' Interrog. 10; Sheindlin Dep. 188:24-189:5, 189:19-191:20; 195:3-13; Pl.'s Resp. to Defs.' Req. for Admis. 2-3 (no lost personal or professional relationships); Sheindlin Dep. 208:20-25 (same); Sheindlin Dep. 206:6-15 (no lost friendships); Pl.'s Resp. to Defs.' Req. for Admis. 4, 5 (no exclusion from organizations); Sheindlin Dep. 209:7-10 (same); *id.* at 85:2-5, 86:5-11 (no lost fans).

64.     When the Court ordered Sheindlin to identify individuals who could speak to her allegations of reputational harm, *see* Dkt. 48, she identified only herself, Rosen, and her proposed reputational harm expert, Sameer Somal.  *See* Pl.'s Suppl. Resp. to Defs.' Interrogs. 4, 12.

65.     Neither Sheindlin, Rosen, nor Somal conducted a poll, focus group, or other objective evaluation of Sheindlin's reputation.  Sheindlin Dep. 48:10-16; Rosen Dep. 26:14-24; Ex. 10, Somal Dep. 103:1-8.

66.     Sheindlin cites comments from online posters to a republication of the Articles by Newsbreak, *see* Compl. ¶ 9; Ex. 25, but she does not know who any of those commenters are, nor does she know those commenters' opinion of her. Sheindlin Dep. 191:5-22, 199:12-20, 203:22-24.

67.     Sheindlin does not have access to viewership or streaming numbers for *Judy Justice* and cannot point to any decline in viewership attributable to the Articles.  Sheindlin Dep. 62:4-6, 62:11-14; Pl.'s Resp. to Defs.' Req. for Admis. 10-11; Pl.'s Suppl. Resp. to Defs.' Interrog. 8; Ex. 16, Dep. of Victoria Jenest ("Jenest Dep.") 17:23-18:4; Ex. 17, Dep. of Lucille Kwak ("Kwak Dep.") 15:20-23; Ex. 15,

Dep. of Austin Ford ("Ford Dep.") 13:21-24; Ex. 19, Dep. of Alan Stein ("Stein Dep.") 16:9-12; Ex. 18, Dep. Of Matthew Pomfret ("Pomfret Dep.") 12:21-13:2; Ex. 24, Amazon Objs. to Defs.' Subpoena at 7-8.

68.    Sheindlin cannot identify any litigant who hesitated or declined to appear on *Judy Justice* because of the Articles.  Pl.'s Suppl. Resp. to Defs.' Interrog. 7; Sheindlin Dep. 54:14-23, 56:2-15 (Sheindlin did not speak with parties or producers); Kwak Dep. 31:14-32:11 (no litigants mentioned the Articles during booking or while dropping out); Ford Dep. 24:18-25:10 (same); Stein Dep. 22:15-23:13 (same); Pomfret Dep. 20:10-21:5 (same); *see also* Kwak Dep. 32:12-16 (no litigants mentioned Sheindlin's views on Menéndez brothers); Stein Dep. 23:22-25 (same); Pomfret Dep. 21:14-17 (same).

69.    Sheindlin does not have an ownership interest in *Judy Justice*, and her compensation is not tied to ratings or viewership.  *See* Sheindlin Dep. 65:13-24, 66:14-67:2, 69:4-23.

70.    Sheindlin and Rosen testified that they had done everything possible to counteract any harm allegedly caused by the Articles.  Sheindlin Dep. 182:13-15 ("I've gotten out as much as I can that it was not true."), Rosen Dep. 139:20-21 ("I did everything in my power to help do what I do in my profession."); *id.* at 111:16-18, 112:14-20, 139:20-24.

## **LEGAL ARGUMENT**

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact' and the moving party is entitled to judgment as a matter of

law." *Pioch v. IBEX Eng'g Servs., Inc.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). Where, as here, the moving party does not bear the burden of proof, summary judgment is appropriate if Sheindlin "fails to make a showing sufficient to establish the existence of an element . . . on which [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In defamation cases, 'because of the importance of free speech, summary judgment is the rule, not the exception.'" *Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *19 (S.D. Fla. Sept. 20, 2023) (R. & R.).

Under Florida law, a plaintiff must prove five elements to prevail on a defamation claim: "(1) publication; (2) falsity; (3) knowledge or reckless disregard as to the falsity on a matter concerning a public official [or public figure]; (4) actual damages; and (5) defamatory content." *Dershowitz v. CNN*, 153 F.4th 1189, 1192 (11th Cir. 2025) (cleaned up).

## I.   SHEINDLIN CANNOT PROVE ACTUAL MALICE BY CLEAR AND CONVINCING EVIDENCE

The Supreme Court has long held that public figures must prove "actual malice"—a term of art meaning that a statement was made with "knowledge that it was false or with reckless disregard of whether it was false or not." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). This level of fault recognizes that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to

14

survive.'" *Sullivan*, 376 U.S. at 271-72.  Given this goal of protecting First Amendment expression, a plaintiff bears the burden of establishing actual malice by clear and convincing evidence, a burden that courts routinely find is "overwhelming."  *See Demby v. English*, 667 So. 2d 350, 354 (Fla. 1st DCA 1995).

To prove actual malice, a plaintiff must produce clear and convincing evidence "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" or that he "acted with a high degree of awareness of probable falsity."  *Dershowitz*, 153 F.4th at 1193 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (on summary judgment, courts must evaluate "whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity").

The actual malice inquiry "focuses on the defendant's state of mind at the time of publication."  *Long v. Arcell*, 618 F.2d 1145, 1147 (5th Cir. 1980).[1]  "The test is not an objective one and the beliefs or actions of a reasonable person are irrelevant."  *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702-03 (11th Cir. 2016) (citing *St. Amant*, 390 U.S. at 731).

There can be no dispute that Sheindlin—a lawyer, arbitrator, former judge, and nationally known television personality who will soon have been on the air

---

[1] Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), decisions handed down by the Fifth Circuit on or before September 30, 1981,are binding as precedent within the Eleventh Circuit.

for thirty consecutive years—is a public figure, public official, or both.  SUMF ¶¶ 55-57; *see Jacoby v. CNN*, 537 F. Supp. 3d 1303, 1309 (M.D. Fla. 2021) ("Public figure status is a question of law to be determined by the court." (cleaned up)), *aff'd*, 2021 WL 5858569 (11th Cir. Dec. 10, 2021).  Thus, she must prove actual malice, and her inability to do so is fatal to her claim.

Here, the undisputed evidence in this case demonstrates that the misidentification in the Articles was a genuine mistake.  Sheindlin's theories of actual malice—that Jaccarino must have known the interviewee in the docuseries was not her; that A360 was grossly negligent in publishing the Articles without further investigation; or that A360 chose to publish the Articles because referencing Sheindlin was financially beneficial—are not borne out by the evidence and would, in any event, be legally insufficient.

## A. The Evidence Shows a Genuine Misidentification

Jaccarino's uncontested testimony demonstrates that he genuinely, but mistakenly, believed the interviewee in the Fox docuseries to be Sheindlin.  *See* SUMF ¶¶ 14-15, 18-21, 24-27; Jaccarino Dep. 72:12–73:11.  This was true at the time of publication and even when he was first alerted to Sheindlin's threat to sue.  SUMF ¶¶ 44-45.  While it was an unfortunate mistake, the evidence shows that it was, in fact, a *mistake*, and that simply does not constitute actual malice. *See Sullivan*, 376 U.S. at 278 (recognizing "defense for erroneous statements honestly made"); *id.* at 292 n.30 ("the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact").

16

Jaccarino explained that he thought the interviewee in the Trailer was Sheindlin based on her appearance and attire (which looked like Sheindlin's signature robe and collar) and because it seemed natural for Fox to have a famous jurist opine on the case.  SUMF ¶¶ 13-15; Jaccarino Dep. 72:8-24, 108:24-110:08.  He explained that he had not seen an image of Sheindlin in some time, and the interviewee appeared to be a slightly older version of the image that came to mind.  SUMF ¶ 15.

For the Court's convenience, here are images of Zamos in the Second Clip and Sheindlin on *Judge Judy*:

 

*See* Second Clip; Rosen Dep. Ex. 5.[2]

Jaccarino also specifically asked Fox for the "Judge Judy" interview. SUMF ¶ 18.  Fox's PR team, clearly understanding which interview he meant,

---

[2] The exhibit is a link to Stephen M. Lepore, *Judge Judy reveals she's ready 'to sue In Touch Weekly for defamation' over 'fabricated' claim she has a 'quest' to 'save' the Menendez brothers after outlet seemingly misidentified her in true crime doc she didn't appear in*, Daily Mail (April 10, 2024), https://www.dailymail.co.uk/news/article-13295121/Judge-Judy-sues-Touch-Weekly-defamation-Menendez-brothers.html.

sent him the Second Clip, also referring to it as the "Judge Judy" clip. *Id.* ¶ 19; Jaccarino Dep. Ex. 6; Jaccarino Dep. 109:12-14 ("moreover, it had been – it didn't even need to be, but it had been corroborated by the people at Fox that this was, indeed, Judge Judy that I was looking at."). Jaccarino's testimony is supported by the documents in this case, including the Trailer, which did not name the interviewee, and Jaccarino's email to Dolan noting that he wanted to review more of the interview before writing the article. *See* SUMF ¶ 16.

### B. Sheindlin Can Offer No Evidence to the Contrary

There is simply no evidence in the record to suggest that Jaccarino or anyone else at A360 *knew* the Articles were inaccurate or harbored *serious doubts* about their accuracy at the time of publication. *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 498 (1984) (no actual malice established where there was no evidence the speaker "realized the inaccuracy of the statement, or entertained serious doubts about its truthfulness, at the time of publication").

Sheindlin argues that Jaccarino *must* have seen the caption and known the interviewee was not her. Compl. ¶ 11; Ex. 20, Pl.'s Resp. to Defs.' Interrogs. 2, 14, 15 ("Defendants are in the business of publishing celebrity news, and Plaintiff is a well-known celebrity."). This essentially asks the Court to disbelieve Jaccarino's testimony—to assume that he is lying—without any evidence to suggest this. The Supreme Court has made clear that such a request is insufficient to survive summary judgment. *See Anderson*, 477 U.S. at 256 ("merely asserting that the

18

jury might, and legally could, disbelieve" the defendant, "without offering any concrete evidence" does not satisfy clear and convincing standard).

Alternately, Sheindlin argues that Jaccarino or Dolan *should* have noticed the caption, done more research, or sought comment from her, so that they could have discovered the mistaken identification before publication. *See* Compl. ¶¶ 11-12; Pl.'s Resp. to Defs.' Interrogs. 2, 14, 15 ("Defendants could have easily confirmed through a simple search engine search"). But under decades of precedent, "a failure to investigate, standing on its own, does not indicate the presence of actual malice." *Michel*, 816 F.3d at 703; *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard").

Sheindlin's attempt to frame these alleged omissions as journalistic misconduct does not salvage her theory. *See generally* Dkt. 57 (seeking leave to belatedly designate a proposed expert on journalistic standards). Even evidence of failure to meet journalistic standards cannot prove actual malice.[3] *Michel*, 816 F.3d at 703 ("Actual malice requires more than a departure from reasonable journalistic standards."); *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 45 (D.D.C

---

[3] To be clear, Sheindlin has not produced any such evidence, only argument. She sought leave to designate an expert in journalistic ethics several months after her deadline to do so, Dkt. 57, but as explained in Defendants' opposition, she cannot show good cause to excuse her failure to comply with the Scheduling Order and, in any event, the testimony would be inadmissible and prejudicial, Dkt. 61.

19

2002) (actual malice cannot be "defined as 'an extreme departure from professional standards'"), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003); *Miami Herald Publ'g Co. v. Ane*, 423 So. 2d 376, 390 (Fla. 3d DCA 1982) (affirming that proof of negligence was insufficient to establish actual malice).  Even if A360 *should* have proceeded differently, in hindsight, actual malice is not judged by "what a reasonable person or a prudent publisher would do." *Lohrenz*, 223 F. Supp. 2d at 45 (cleaned up).

Finally, Sheindlin contends that A360 published the Articles because using her name was financially beneficial.  *See, e.g.*, Pl.'s Resp. to Defs.' Interrogs. 2, 14. There is simply no evidence in the record to support this claim.  *See* A360 Dep. 34:7-20, 38:5-14 (testifying that A360 cannot track print sales by specific article or subject) .  Even if it were true, the Supreme Court has made clear that a profit motive in publishing does not prove actual malice, absent proof that the author was subjectively aware that the statements were false.  *See Harte-Hanks*, 491 U.S. at 667 ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases . . . would be little more than empty vessels").

Sheindlin cannot point to any evidence that Jaccarino, the author of the Articles, "actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false." *Michel*, 816 F.3d at 703.  To the contrary, he repeatedly testified that *nothing* in the materials he reviewed caused him to doubt that the interviewee was Sheindlin.  Jaccarino

109:10-12 ("In my mind, as I told you earlier, there was no question that I was looking at Judge Judy."); *id.* at 110:6-8 ("My hackles weren't raised in any way, shape, or form that I wasn't –this wasn't Judge Judy. Nothing about this seems extraordinary."); *id.* at 111:9-12 ("This was a major case that riveted the attention of the country. The idea that she sat in and watched it didn't seem far-fetched enough to raise any alarm bells in my head."); *see* SUMF ¶¶ 14-15, 24, 27, 44-45.

\* \* \*

For the foregoing reasons, Sheindlin cannot prove actual malice, and summary judgment should be granted for Defendants on her defamation claim.

## II. SHEINDLIN CANNOT PROVE THAT SHE SUFFERED ANY ACTUAL DAMAGES ATTRIBUTABLE TO THE ARTICLES

For four decades, Florida law has required that plaintiffs suing media companies for defamation prove actual damages as an element of their claim. *Mid-Fla. Television Corp. v. Boyles*, 467 So. 2d 282, 283 (Fla. 1985); *see Blake v. Giustibelli*, 182 So. 3d 881, 884-85 (Fla. 4th DCA 2016) ("in libel cases involving media defendants, . . . proof of damages must always be established"); *Edelstein v. WFTV, Inc.*, 798 So. 2d 797, 797-98 (Fla. 4th DCA 2001) (per curiam) (same).

This is true regardless of whether the plaintiff styles the claim as one for defamation *per se* or *per quod*, as the Florida Supreme Court did away with this distinction in media cases. *Boyles*, 467 So. 2d at 283; *id.* at 284 (Ehrlich, J., concurring specially) ("Libel per se is dead."); *Corsi v. Newsmax Media, Inc.*, 519 F. Supp. 3d 1110, 1119 (S.D. Fla. 2021) (Florida has "eliminate[d] presumed

21

damages for defamation *per se* actions against media defendants" after *Boyles*).

Where, as here, a plaintiff cannot produce admissible evidence of actual damages attributable to the publication at issue, summary judgment must be granted for the defendant. *See Egwuatu v. Burlington Coat Factory Warehouse Corp.*, 2011 WL 2413833, at *5 (M.D. Fla. June 10, 2011) (granting summary judgment for defendant where there was "[n]o evidence in the record" of "damages resulting from any alleged defamatory statement"); *Dibble v. Avrich*, 2015 WL 12532615, at *5, *7 (S.D. Fla. July 29, 2015) (granting summary judgment for defendant where plaintiff alleged only personal and professional reputational harm but offered no evidence of either); *see also Edelstein,* 798 So. 2d at 798 (affirming dismissal of complaint where plaintiff relied on presumption of damages under *per se* theory, rather than alleging actual harm).

Sheindlin initially alleged financial, emotional, and both personal and professional reputational harm. *See* Compl. ¶¶ 47-54. Over the course of discovery, she has abandoned or conceded that she cannot prove almost all of these allegations. SUMF ¶¶ 60, 62-64. All that remain are her allegations that the Articles have injured her reputation as a "fair-minded and good judge of character" and have negatively impacted *Judy Justice* by lowering viewership or deterring litigants from appearing. Compl. ¶¶ 51-52. As she cannot offer any admissible evidence to support these claims, the Court must grant summary judgment for Defendants.

### A.   Sheindlin Cannot Prove that the Articles Harmed Her Reputation

Sheindlin cannot prove her claim that the Articles negatively impacted her reputation as a "fair, deliberate, wise, and no-nonsense judge of people and facts." Compl. ¶¶ 7-8. Sheindlin cannot identify any single person whose opinion of her was negatively impacted by the Articles. SUMF ¶ 63. Nor has she produced or commissioned an objective assessment of her reputation. *Id.* ¶ 65. Instead, Sheindlin relies on a misunderstanding of Florida law, the testimony of her reputation expert (who admits that he never evaluated *whether* she was harmed), inadmissible and inherently unreliable anonymous online comments, and her own conclusory testimony. None of these satisfies her burden of proof.

*First*, Sheindlin's theory that the Articles constitute defamation *per se*, such that damages can be presumed, *see* Compl. ¶ 48, fails as a matter of law. Proof of actual damages are required as an element of her claim. *See Boyles*, 467 So. 2d at 283; *Edelstein,* 798 So. 2d at 798.

Even if the *per se* distinction were relevant, the Articles would not be defamatory *per se* (or defamatory at all), as the Articles do not, on their face, impugn Sheindlin's professional abilities as a television arbitrator. *See Layne v. Trib. Co.*, 146 So. 234, 237 (1933) (in defamation *per se* "the language of the publication itself can alone be looked to, without the aid of innuendoes"). Put differently, ascribing to Sheindlin (even incorrectly) an opinion that a court should re-consider the fairness of life sentences handed down to two young

23

adults, in light of evidentiary exclusions and lessons learned in the 35 intervening years, simply does not make her appear so "odious" as to warrant presumed damages, even if they were otherwise available against a media defendant.

*Second,* Somal's testimony does not constitute proof of actual harm. Somal admits that he never evaluated *whether* Sheindlin actually suffered any harm. *See* Defs. Mot. *in Limine* to Exclude the Report and Testimony of Sameer Somal ("Daubert Mot.") at 5, 10-14. He simply assumed that Sheindlin's allegations were true and that the statements were defamatory *per se—i.e.*, that they presumptively caused harm— contrary to Florida law. Somal Dep. 88:20-23 (" I assumed the allegations by the plaintiff, as represented by counsel, to be true, which is, hence, why I use the word 'defamatory'" ); Somal Dep. Ex. 4 at 12-13. As explained more fully in the Daubert Motion, Somal's expert testimony is also inadmissible, as it lacks evidentiary support, applies an unreliable methodology, and improperly invades the province of the jury.

*Third,* Sheindlin points to a cherry-picked selection of anonymous online comments, Compl. ¶ 9, but these out-of-court statements, made by unknown individuals, are unauthenticated and inadmissible as hearsay. *See* Fed. R. Evid. 802, 901. Courts routinely reject such comments as "inherently unreliable." *United States v. Jackson,* 208 F.3d 633, 638 (7th Cir. 2000) (excluding web postings as "prejudicial, irrelevant, and hearsay" as well as unauthenticated and unreliable); *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 2014 WL 4651643, at *7 (D. Colo. Sept. 18, 2014) (ruling

online comments inadmissible, "inherently unreliable," and an improper basis for expert testimony); *see* Daubert Mot. at 11-13 (citing additional case law).

Even putting aside the evidentiary concerns, the mere proximity of negative comments to a version of the Article—notably, *not* a version published by A360, *see* SUMF ¶ 66; Ex. 25—does not prove that the comments were *caused by* the article. Sheindlin does not know and cannot identify any of the authors of the comments she cites, and she cannot say for sure that they were people, rather than bots. Sheindlin Dep. 199:12-20, 203:22-24. The parties cannot determine, for example, whether someone who posted negatively about Sheindlin did so in response to the Article, out of a pre-existing dislike for her, or simply to stir up controversy in the comments section. Nor can the parties interrogate the many *positive* comments about Sheindlin or the comments that do not reference her at all. In sum, even if they were admissible, online comments do not establish that anyone thought highly of Sheindlin, read and believed the Articles, and then thought less of her as a result.

*Fourth,* Sheindlin's own claims that the Articles harmed her reputation should be disregarded, as they are unsupported by evidence. She insists that the Articles harmed her reputation because they differ from her preferred image as a "law and order girl" who believes there is "never an excuse for committing a crime." Sheindlin Dep. 46:18-47:3.[4] But this theory is pure speculation.

---

[4] Sheindlin was never a criminal court judge and has not been a sitting judge since 1996. *See* Sheindlin Dep. 14:20-16:24, 120:23-121:6; SUMF ¶ 55.

25

Sheindlin has offered no evidence to suggest that the public shares this self-perception, nor has she identified anyone who held that opinion (or any specific opinion of her) and changed that opinion for the worse after reading the Articles. SUMF ¶¶ 63-65. She has not, for example, identified any fan of her shows who expressed concern over her reported support for the Menéndez brothers. *See* Sheindlin Dep. 85:2-5, 86:5-11. In fact, Sheindlin recognizes that public perception of her is mixed—"Either you love me or you hate me"—and testified that she does not know what *anyone* thinks of her, let alone whether the Articles made anyone think less of her. *Id.* 75:16-17, 191:5-22.

*Finally*, the evidence in this case tends to disprove Sheindlin's claim of reputational harm. *Judy Justice*, the show on which she starred in April 2024, was renewed for a fourth season, and Amazon has since begun streaming a second show starring Sheindlin, *Justice on Trial*. SUMF ¶ 61; Sheindlin Dep. 26:2-14.

*Judy Justice* producers—who regularly talk to potential litigants—testified that Sheindlin has a strong, positive reputation, with one characterizing her as the "Mount Rushmore of judges." Stein Dep. 25:20-24; Kwak Dep. 34:16-19 ("I think she has a stellar reputation. I mean I think that's why she's a legend, you know."). They also testified that her reputation remains steady or only improves over time. Stein Dep. at 26:14-23 ("I think people who love her, love her. I think people who don't, don't. I don't know if that really changes much. . . . But I imagine most of her fan base has stuck by her."); Kwak Dep. 35:3-5 ("I feel like in

26

the number of years she's become more revered").

## B.    There Is No Evidence that the Articles Negatively Impacted *Judy Justice*

Sheindlin also contends that the Articles harmed *Judy Justice* by "deterring viewers from watching her shows" and "discouraging parties from bringing their disputes before her."  Compl. ¶¶ 51-52.  Sheindlin has not produced any evidence to support these claims.  *See* SUMF ¶¶ 67-68.

Neither Sheindlin nor her producers receive viewership information for *Judy Justice*, and Sheindlin admitted that she cannot point to any specific change in viewership.  *See id.*  In the absence of viewership data, Sheindlin measured the success of her show by whether Amazon renewed it, which it did.  Sheindlin Dep. 62:15-25; *id.* 63:18-64:5 ("They would certainly be stupid business people if they renewed something that wasn't performing.").

Sheindlin also cannot prove that any would-be litigant was deterred by the Articles from appearing on the program.  *See* SUMF ¶ 68.  By design, Sheindlin does not speak to litigants or speak to her producers about them before they appear on *Judy Justice*, so she has no personal knowledge of this claim. Sheindlin Dep. 56:4-23 (testifying that she seeks to create a court-like process); Pl.'s Suppl. Resp. to Defs.' Interrog. 7 ("Plaintiff at present is not aware of any individual who she believes has chosen not to bring a dispute before her based on the articles at issue and can produce no witnesses to that effect.").

Her producers, who contact parties that might be good candidates to

27

appear on the show, also could not identify any would-be litigants who declined to appear on the show or even expressed concern about doing so because of the Articles. SUMF ¶ 68; Kwak Dep. 14:5-15:7 (describing producers' role); Ford Dep. 24:18-25:10 (no litigants ever mentioned the Articles to him); Stein Depo 16:13-15 (same). Nor could anyone identify a qualitative change in applicants across seasons. *See* Kwak Dep. 34:2-6 (when asked, responding, "No. I think every season is really exciting and juicy."). Several producers testified that they had never read the Articles and did not know about Sheindlin's lawsuit until the deposition process. *See, e.g.*, *id.* 35:6-36:21.

Finally, even if Sheindlin could demonstrate harm to *Judy Justice*'s viewership or applicant pool that was attributable to the Articles—which she cannot—she cannot prove that harm to the *show* is a compensable, actual harm to *her*. *See Valencia v. Citibank Int'l*, 728 So. 2d 330, 330 (Fla. 3d DCA 1999) (requiring "that the falsity of the statement caused injury to the plaintiff"). Sheindlin does not have any financial or ownership interest in the show; her compensation is not impacted by either of these metrics; and she has not offered any explanation why she, an individual, would be able to recover damages for this alleged harm to a television show owned by Amazon. SUMF ¶ 69.

## C.  Sheindlin Has Abandoned Her Other Allegations of Harm

Sheindlin has abandoned or conceded that she cannot prove her other allegations of harm. She is no longer seeking damages for emotional distress. SUMF ¶ 54. She has not lost any professional relationships or been excluded

28

from any professional organization because of the Articles.  SUMF ¶¶ 60, 63; Pl.'s Resp. to Defs.' Req. for Admis. 3, 5; Sheindlin Dep. 208:20-25, 209:7-9.  She cannot identify any business opportunity that she lost, SUMF ¶ 60, and in fact, she renewed *Judy Justice* and began a new show after the Articles, *id.* ¶ 61.

Moreover, Sheindlin testified that the Articles were "not life altering" for her, and while the case is "a lawsuit about money . . . it's not money to change my life [as] I've got a lot of money."  Sheindlin Dep. 183:6, 183:9-11.  She has also repeatedly told the press that she is pursuing this case to deter A360 from writing about her and to make it "expensive" for A360.  *See, e.g.*, Rosen Ex. 22, 23 at 2, 24 (providing statement from Sheindlin to press that, "When you fabricate stories . . . it's going to cost you . . . it's unconscionable and will be expensive. It has to be expensive so that you will stop.").

\* \* \*

As Sheindlin cannot prove actual damages, an essential element of her claim, the Court should enter summary judgment in Defendants' favor.

## III.    SHEINDLIN CANNOT PROVE PUBLICATION BY ACCELERATE

Despite naming both A360 and Accelerate as Defendants, Sheindlin cannot prove that Accelerate "published" the Articles at issue.  As "publication of a statement is a necessary element in a defamation action, only one who publishes can be subject to this form of tort liability." *Markle v. Markle*, 2023 WL 2711341, at \*5 (M.D. Fla. Mar. 30, 2023) (quoting *Doe v. Am. Online, Inc.*, 783 So. 2d 1010, 1017 (Fla. 2001)) (dismissing defamation claims with prejudice where

defendant did not publish the book at issue); *see Dershowitz*, 153 F.4th at 1192

("publication" is an essential element of a defamation claim); *Klayman v. City*

*Pages*, 2015 WL 1546173, at \*7-10 (M.D. Fla. Apr. 3, 2015) (granting summary

judgment for defendant Voice Media Group where there was no evidence that it

had published the statements at issue), *aff'd*, 650 F. App'x 744 (11th Cir. 2016).

A360 published the Articles.  SUMF ¶¶ 1-2, 5.  Accelerate had no role in the

drafting, editing, or publishing the Articles, or *National Enquirer* or *In Touch*

*Weekly*, generally.  SUMF ¶ 7.  Thus, summary judgment should be granted in

Accelerate's favor on this ground as well.

## IV.    SHEINDLIN CANNOT PROVE ENTITLEMENT TO PUNITIVE DAMAGES

Even if Sheindlin could survive summary judgment on the issue of liability,

the Court should preclude her from seeking punitive damages, as she cannot

prove any of the required elements.[5]  A defamation plaintiff seeking punitive

damages bears a formidable three-pronged burden.  Under Florida common law,

a plaintiff must prove that the defendant acted with express or common law

malice—meaning "that the defendant acted with a primary motive to injure the

plaintiff personally."  *CNN v. Black*, 374 So. 3d 811, 816 (Fla. 4th DCA 2023); *see*

*also Montgomery v. Knox*, 3 So. 211, 217 (Fla. 1887) (punitive damages do not

---

[5] Defendants also object to any effort by Sheindlin to seek punitive damages because she did not seek them in her Complaint.  Her counsel attributes this to the fact that she originally filed in Florida state court, which does not allow demands for punitive damages at the outset, but Sheindlin has not amended or sought leave to add a demand for punitive damages since removal.

arise unless there is "ill will, hostility, evil intention to defame and injure"). Under the First Amendment, a plaintiff must prove constitutional actual malice. *CNN*, 374 So. 3d at 817. These are in addition to the requirement, applicable in all tort cases, that a plaintiff must prove that the conduct at issue is sufficiently outrageous to justify punitive damages. *See Hosp. Specialists, P.A. v. Deen*, 373 So. 3d 1283, 1288 (Fla. 5th DCA 2023). Sheindlin cannot clear this high bar.

*First*, the record is devoid of evidence to suggest that A360 published the Articles with a specific intent to injure Sheindlin, as required to show express malice. *See CNN*, 374 So. 3d at 817; *see also Egwuatu*, 2011 WL 2413833, at \*5 ("express malice" requires proof "that the defendant's primary motive in making the statements was the intent to injure the reputation of the plaintiff"). To the contrary, A360's motivation in publishing the Articles was public interest in the Menéndez brothers and in true crime, more generally. SUMF ¶¶ 29, 31.

Where, as here, a speaker is motivated by a purpose other than a desire to harm the plaintiff, express malice is absent. *Nodar v. Galbreath*, 462 So. 2d 803, 811-12 (Fla. 1984) (holding that express malice had not been proven where defendant's statements were motivated by "parental concern" about schools, not ill will towards teacher); *Collier Cnty. Publ'g Co. v. Chapman*, 318 So. 2d 492, 495 (Fla. 2d DCA 1975) (reversing punitive damages award where "[t]he defendant was not intentionally trying to damage the plaintiff's business" and "[t]here was no spite or ill will involved").

There is also no evidence to suggest that anyone at A360 thought the

Articles were disparaging to Sheindlin. Jaccarino believed she had voluntarily appeared in the docuseries. *See* Jaccarino Tr. 109:4-22 (explaining that he did not find it unusual for a judge to discuss a high-profile case). As such, he had no reason to think that she would take offense to reporting about that appearance. This, too, precludes a finding of express malice; logically, a defendant cannot possess a "primary purpose" of inflicting harm by publishing a statement that he does not believe to be harmful in the first place.

Even Sheindlin does not meaningfully contend that A360 set out to harm her—she attributes the Articles to profit- or attention-seeking. *See* Compl. ¶ 30 ("Defendants, motivated by the need to drive internet traffic and clicks to fuel their ad revenue . . . ."); Sheindlin Dep. 208:9–10 ("They put it on there in order to be shocking."); *id.* at 81:23–25; 96:3 (theorizing that attributing support for the Menéndez brothers to a "law and order" judge was "contrary to expectation," serving as an "eye-grabber"). While she describes this as "arrogance," *id.* at 78:17, even if such evidence existed (it does not), neither arrogance nor a profit motive constitutes the "evil intention to defame" required for punitive damages. *Schiller v. Viacom, Inc.*, 2016 WL 9280239, at *12-13 (S.D. Fla. Apr. 4, 2016) (granting summary judgment on punitive damages where evidence "at worst" suggested a motive to increase profit or viewership and there was "no evidence whatsoever" that defendants primarily intended to inflict injury).

*Second*, as shown above, Sheindlin cannot prove actual malice.

*Third*, mistakenly identifying Sheindlin as a supporter of the Menéndez brothers—a position held by celebrities, members of the public, and even the Los Angeles County District Attorney, who recommended leniency, *see* SUMF 9—is simply not so outrageous as to lead an "average member of the community . . . to exclaim, 'Outrageous!'" *Hosp. Specialists*, 373 So. 3d at 1288.

As Sheindlin never properly alleged a claim for punitive damages and cannot prove any of the three elements required to recover them, the Court should grant summary judgment for Defendants on this ground as well.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant this motion, enter summary judgment in their favor on Sheindlin's single count for defamation, and grant such other and further relief as the Court sees fit.

Respectfully submitted, this 15th day of December 2025.

BALLARD SPAHR LLP

/s/ *Jacquelyn N. Schell*
Charles D. Tobin (Fla. Bar No. 816345)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Tel: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com

Jacquelyn N. Schell (*pro hac vice*)
Bradley Gershel (*pro hac vice*)
Saumya Vaishampayan (*pro hac vice*)
1675 Broadway, 19th Floor
New York, NY
Tel:  (212) 223-0200
Fax:  (212) 223-1942

schellj@ballardspahr.com
gershelb@ballardspahr.com
vaishampayans@ballardspahr.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of December 2025, I filed a true and correct copy of the foregoing with the Court's web portal, which will provide copies to all counsel of record.

/s/ *Jacquelyn N. Schell*
Jacquelyn N. Schell (*pro hac vice*)

34