UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JUDY SCHEINDLIN,

      Plaintiff,

    v.

ACCELERATE 360, LLC, and A360
MEDIA, LLC,

      Defendants,

Case No. 2:24-CV-553-KCD-NPM

## **ORDER**

For many decades, Plaintiff Judy Sheindlin—known to millions of daytime television viewers simply as Judge Judy—has cultivated a public reputation as a tough-on-crime, no-nonsense arbitrator. The defendants in this case, A360 Media, LLC and Accelerate360, LLC (collectively "A360"), operate in a very different sphere: they publish and distribute celebrity news and tabloids, including the *National Enquirer* and *In Touch Weekly*.

In April 2024, their worlds collided. A360 published articles claiming that Sheindlin had appeared in a true-crime docuseries to advocate for the resentencing of Lyle and Erik Menendez, the notorious brothers convicted of murdering their parents. (Doc. 7 at 1-2.) The articles reported that Scheindlin felt the brothers had been railroaded. And they quoted her as claiming the trial was "rigged." (*Id.*)

It turns out none of this was true. An A360 reporter had watched a clip from the docuseries and mistakenly identified a different older woman—an alternate juror named Judi Zamos—for the famous television judge. Predictably, Sheindlin was not pleased. She filed this defamation lawsuit, alleging that the false reports subjected her to public ridicule and tarnished her carefully curated brand. (*See* Doc. 7.)

A360 now seeks summary judgment. (Doc. 86.) It readily admits the stories were wrong, but argues that the misidentification was an honest, if unfortunate, mistake. Because of this, A360 contends that Sheindlin cannot clear the high constitutional hurdle of proving actual malice—a strict requirement for public figures suing for defamation. Furthermore, A360 argues that Sheindlin cannot prove she suffered any actual, compensable damages under Florida law.

Because the First Amendment requires a showing of actual malice rather than mere negligence, and because Sheindlin has failed to produce evidence meeting that heavy burden, her defamation claim must fail. A360's motion for summary judgment is thus **GRANTED**.

## I. Background

The following facts are uncontested unless otherwise noted. Where genuine disputes do exist, the Court views the record—as it must at this

stage—in the light most favorable to the plaintiff. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020).

Scheindlin is a retired judge-turned-television personality. (Doc. 7 ¶ 24.) She is widely known by the name of her original "television arbitration show," Judge Judy. (Doc. 95 ¶ 2.). She is "a national staple" and "household name." (*Id.* ¶¶ 2-3.)

Lyle and Erik Menendez are also famous. In 1996, they were notoriously convicted of killing their parents. (Doc. 86 ¶ 8.) "In recent years, celebrities, members of the public, and even the Los Angeles County District Attorney have supported resentencing or releasing" the brothers, "who have served more than thirty-five years in jail and were recently eligible for parole." (*Id.* ¶ 9.)

A360 owns and operates two tabloids, *National Enquirer* and *In Touch Weekly*. (Doc. 86 ¶ 1, Doc. 95 ¶ 6.) *In Touch* featured an article entitled "Inside Judge Judy's Quest to Save the Menendez Brothers." (Doc. 7 ¶ 25.) The piece prominently displayed a photograph of Sheindlin wedged between the notorious convicted murderers. It said that the brothers had "gained a powerfully ally in their quest for a retrial—Judge Judy Scheindlin." (*Id.*) To support this assertion, the article claimed that the "popular TV jurist" had declared the brothers' trial "rigged!" (*Id.*) It further reported that Scheindlin

had "sat in on much of the pair's second trial in the 1990s after their first [trial] ended with deadlock juries [sic]." (*Id.*)

*National Enquirer* doubled down on this story. It boasted a front-page teaser reading "True Crime! Judge Judy's FIGHT FOR LYLE & ERIK with a photo of [Scheindlin] and the two brothers." (Doc. 7 ¶ 36.) The corresponding article claimed Scheindlin had appeared in a "FOX Nation docuseries" covering the Menendez brothers. (Doc. 7 at 50.) And the article was titled "BALONEY! Judge Judy on Warpath to save Menendez bros." (*Id.* ¶ 37.)

Baloney is right. Only it better describes the articles themselves. Scheindlin never said the things attributed to her. She never attended the Menendez brothers' trial. And she never appeared in the docuseries. A360's reporter had gotten it completely wrong, confusing another woman in the documentary for Scheindlin. Here is a side-by-side comparison of the two:

 

(Doc. 86 at 17.)

How did a reporter make such a colossal mix-up? The misidentification traces back to a promotional pitch. In March 2024, Fox News contacted A360 about an upcoming docuseries on the Menendez brothers. The pitch included a link to the show's trailer. That trailer featured a brief clip of an older woman with short hair, wearing a black top with a decorative white collar, who opined that the brothers' trial was rigged. The woman was not identified by name in the video. (Doc. 86 ¶¶ 10-13.)

Upon watching the trailer, A360 reporter Michael Jaccarino jumped to a conclusion: the woman was Judge Judy. He based this on her clothing— which he thought resembled Sheindlin's signature judicial robe and lace collar—and the fact that she was commenting on a high-profile legal matter. Jaccarino admitted he had not seen a photograph of Sheindlin in years and simply assumed she had aged into the woman on his screen. (*Id.* ¶¶ 14-15.)

Seeking to flesh out his story, Jaccarino emailed Fox asking for more footage of the "Judge Judy interview." (Doc. 95-6.) A Fox public relations representative replied with a link to a longer, 40-second clip, telling Jaccarino to "please see below for a link to the Judge Judy clip." (*Id.*)

This is where the investigation fatally stalled. In this second clip, an on-screen caption appears for roughly three seconds, explicitly identifying the interviewee as "Judi Zamos," an alternate juror from the first Menendez trial. Jaccarino testified that he completely missed this flashing red warning sign.

His explanation was simple: he was looking down at his keyboard, laser-focused on transcribing the audio rather than watching the screen. (Doc. 86 ¶¶ 20-21, Doc. 95 ¶ 9.)

Operating under the unshaken assumption that he had his star subject, Jaccarino pressed forward with the article. He researched the gruesome details of the murders and called a defense attorney for a quote on the current legal proceedings. What he did not do, however, was conduct a basic internet search coupling Sheindlin's name with the Menendez brothers to verify the connection. Nor did he follow standard journalistic practice by reaching out to Sheindlin or her representatives for comment prior to publication. (Doc. 86 ¶ 25, Doc. 95 ¶ 10.)

The editorial review process provided no safety net. Jaccarino sent his draft to his editor, Michael Hammer, and included the link to the video clip—the very clip that identified the speaker as Judi Zamos. Hammer never clicked the link or watched the video. He testified that he simply took his reporter at his word. (Doc. 95 ¶ 11.) From there, the story was cleared for the *National Enquirer* and *In Touch Weekly*.

Scheindlin now sues A360 for defamation, claiming its false reporting caused her reputational harm and "deterr[ed] viewers from watching her shows." (Doc. 7 ¶ 51.)

## II. Legal Standard

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Smothers v. Childers*, 159 F.4th 922, 930 (11th Cir. 2025). "When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). A genuine issue exists if a reasonable jury could return a verdict for the nonmoving party. *See, e.g.*, *Martinez v. GEICO Cas. Ins. Co.*, 152 F.4th 1323, 1330 (11th Cir. 2025). "And a fact is material if it might affect the outcome of the suit under the governing law[.]" *Gervin v. Florence*, 139 F.4th 1236, 1245 (11th Cir. 2025).

The moving party "bears the initial burden to demonstrate the basis for its motion, and must identify the portions of the record which it believes demonstrates the absence of a genuine issue of material fact." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018). "The burden then shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). In reviewing the

evidence, the court draws all reasonable inferences in the nonmoving party's favor. *See Sconiers*, 946 F.3d at1263.

## III. Discussion

A360 presses several arguments. The Court need only address one: actual malice. The parties agree that Florida defamation law applies here. And there is no dispute that Scheindlin is a public figure. This means she must prove by clear and convincing that A360 made its false statements with "actual malice." *See, e.g.*, *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020); *Flynn v. Wilson*, 398 So. 3d 1103, 1110 (Fla. Dist. Ct. App. 2024).

This is hard to do. *See Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1309 (S.D. Fla. 2015) (actual malice standard "presents a heavy burden"); *Block v. Matesic*, 789 F. Supp. 3d 1131, 1169 (S.D. Fla. 2025) (deeming actual malice's clear-and-convincing-evidence standard "undoubtedly difficult to satisfy"); *Basulto v. Netflix, Inc.*, No. 1:22-CV-21796, 2023 WL 7129970, at *24 (S.D. Fla. Sept. 20, 2023) ("This standard is so high that this Court last found a triable issue on actual malice in cases against media defendants brought by public figures in 1983."). The test demands proof that a defamatory statement was published with either "actual knowledge of its falsity or with a high degree of awareness of its probable falsity." *Berisha*, 973 F.3d at 1312.

A publisher's failure to investigate a statement's accuracy alone won't cut it. *Lam v. Univision Commc'ns, Inc.*, 329 So. 3d 190, 198 (Fla. Dist. Ct.

App. 2021); *see also Jacoby v. Cable News Network, Inc.*, 537 F. Supp. 3d 1303, 1311 (M.D. Fla. 2021). Nor will "even an extreme departure" from reasonable journalistic standards. *Berisha*, 973 F.3d at 1312; *Levan v. Cap. Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir. 1999); *Klayman v. City Pages*, 650 F. App'x 744, 750–51 (11th Cir. 2016). Instead, there must be evidence that the defendant "entertained serious doubts as to the truth of this publication." *Berisha*, 973 F.3d at 1312; *see also Jacoby*, 537 F. Supp. 3d at 1311 ("[T]here must be some showing that the defendant purposefully avoided further investigation with the intent to avoid the truth."). Or the statement needs to be so obviously implausible that further investigation was necessary. *See Hunt v. Liberty Lobby*, 720 F.2d 631, 644 (11th Cir. 1983) ("[A] publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements."); *Tobinick*, 108 F. Supp. 3d at 1310 ("An inference of malice may be drawn when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation, or where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."); *Readon v. WPLG, LLC*, 317 So. 3d 1229, 1236 (Fla. Dist. Ct. App. 2021) ("Florida law is well settled that the failure to investigate, without more, does not constitute actual malice. Instead, there

9

must be "obvious reasons to doubt the veracity of the informant or the accuracy of his reports.").

We have none of that here. The undisputed evidence shows that A360's reporter believed Scheindlin was in the docuseries. He testified that the woman's clothing resembled Sheindlin's trademark black robe and white collar, attributing any physical differences to natural aging. He also found it perfectly logical that a prominent television jurist would opine on a high-profile criminal trial. Nothing about those inferences is so obviously incredible that it demanded further digging. According to the record, the reporter never doubted that he saw Scheindlin.

In fact, his mistake was reinforced by the documentary's own producers. After requesting "additional video of the Judge Judy interview," he received a video link expressly identifying it as "the Judge Judy clip." (Doc. 86-4 at 23.) True, that clip briefly labeled the woman by her true name. But the reporter claims he missed it since he had been looking down while transcribing the woman's comments.

Against this backdrop, it is apparent that A360 merely made a genuine (though stupid) mistake. And contrary to Scheindlin's suggestion, that a jury could disbelieve this evidence cannot save her from summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986) ("[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary

conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."); *Varnedoe v. Postmaster Gen.*, No. 21-11186, 2022 WL 35614, at *3 (11th Cir. Jan. 4, 2022); *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1052 (11th Cir. 2017). Putting everything together, the Court simply cannot find actual malice.

Still, Scheindlin pushes back, stressing that A360 violated "bedrock principles of journalism." (Doc. 95 at 12.) To bolster this claim, she offers the testimony of a journalism expert. There is a procedural snag, however: she failed to disclose this expert before the Court's deadline. Recognizing the misstep, Sheindlin seeks to amend the scheduling order to let her expert's opinion into the record. (Doc. 57.) But even if the Court were inclined to grant that extension—which it is not—Scheindlin still loses.[1]

All her expert offers is a critique of A360's journalism. He picks apart its publishing process and charges it with "shallow reporting, cursory editing, and little or no fact-checking." (Doc. 95-21 at 21.) That might all be true. But again, crappy journalism does not equal actual malice. *See Berisha*, 973 F.3d

---

[1] Scheindlin's Motion to Permit Submittal of Journalism Expert (Doc. 57) fails to demonstrate the necessary good cause. The timeline reveals why. The information underlying her expert's opinion could have been discovered much sooner. Scheindlin knew in August 2024 which witnesses would be key to exploring her journalistic standards argument. (Doc. 61 at 3, Doc. 61-2 at 3.) Yet she waited until April 30, 2025—less than a month before the expert-disclosure deadline—to even try to depose them. (Doc. 44, Doc. 61-3 at 2.) That is not the diligent pursuit of discovery. *See De Varona v. Disc. Auto Parts, LLC*, 285 F.R.D. 671, 673 (S.D. Fla. 2012); *Arvelo v. USA Boxing, Inc.*, No. 6:22-CV-314-WWB-RMN, 2023 WL 3975311, at *1 (M.D. Fla. May 19, 2023). Accordingly, her motion falls short.

11

at 1312; *see also Levan*, 190 F.3d at 1239 ("Actual malice requires more than a departure from reasonable standards of journalism[.]"); *Don King Prods., Inc. v. Walt Disney Co.*, 40 So. 3d 40, 46 (Fla. Dist. Ct. App. 2010) ("The law is well established that the failure to investigate, without more, does not constitute actual malice.") Absent second-guessing of the story's truth or its "inherent improbability," which is not present here, A360's deficient reporting does not equal actual malice. *Hunt*, 720 F.2d at 645; *see also Levan*, 190 F.3d at 1239. So even if allowed in, Scheindlin's expert would make no difference.

Lastly, Scheindlin emphasizes that A360's profit motive tilts the scales in her favor. But "the fact that the defendant published" false statements "to increase its profits" does not "suffice to prove actual malice." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989); *see also McInnes v. S. Poverty L. Ctr., Inc.*, 811 F. Supp. 3d 1319, 1332 (M.D. Ala. 2025). And even when taken together with A360's shoddy investigation, it still falls short.

### IV. Conclusion

The First Amendment provides breathing space for the press, protecting it even when it makes embarrassing and careless mistakes. To recover damages for those mistakes, a public figure must prove that the publisher acted with actual malice—a subjective realization of falsity or a

reckless disregard for the truth. Sheindlin has not met this demanding standard. She has no evidence that A360 knew it was misidentifying her or that anyone involved ever questioned her appearance in the docuseries. Nor is the premise of a television judge commenting on a high-profile murder trial so inherently improbable as to raise obvious red flags. Against this backdrop, allegations that A360 skirted journalistic standards in pursuit of profit will not bridge the evidentiary gap to prove actual malice.

Because Sheindlin cannot establish the essential elements of her defamation claim, the inquiry ends here. A360's Motion for Summary Judgment (Doc. 86) is **GRANTED**. The Clerk is **DIRECTED** to enter judgment, terminate all pending motions, and close the case.

**ORDERED** in Fort Myers, Florida on April 16, 2026

Kyle C. Dudek
United States District Judge

13